**In re Daniel J. FARLEY, Debtor.**

**Terrence SEILER and Karen Bray, Plaintiffs,**

**v.**

**Daniel J. FARLEY, Defendant.**

**Bankruptcy No. 90-3398-BM.**
**Adv. No. 91-0069-BM.**

United States Bankruptcy Court, W.D. Pennsylvania.

July 22, 1993.

Daniel J. Farley, pro se.

Joel B. Johnston, Schuchert Sheerer, P.C., Pittsburgh, PA.

### MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Plaintiffs Terrence Seiler and Karen Bray seek a determination that a debt owed to them by debtor/defendant Daniel J. Farley is not dischargeable pursuant to 11

U.S.C. § 523(a)(2)(A) and/or 11 U.S.C. § 523(a)(4).

Debtor denies that these provisions of the Bankruptcy Code affect the dischargeability of the debt.

Judgment will be entered in favor of debtor and against plaintiffs, who have failed to show that the debt in question is not dischargeable pursuant to these provisions.

## I

## FACTS

Debtor held himself out as an expert on tax shelters and began preparing plaintiffs' tax returns in approximately 1976. At that time, he proposed creating a tax shelter for plaintiffs involving ownership of a horse. Debtor also is the sole shareholder and sole principal of Meadowlands Marketing and Management Company, Inc. ("MMM") and is a shareholder and a principal of Arden Hill Farms, Inc. ("AHF").

Plaintiffs are husband and wife. Terrence Seiler is in the construction business and Karen Bray is a nurse.

Several transactions involving Seiler and debtor took place on September 15, 1979.

Seiler and MMM executed an agreement on September 15, 1979 whereby MMM sold an American saddlebred horse named "Midnight Secret" to Seiler for the sum of $45,-000.00. MMM warranted that Midnight Secret was in foal at that time and agreed to replace Midnight Secret with another broodmare in foal equal in value should Midnight Secret fail to carry foals to term in 1980 and 1981.

Contemporaneously, Seiler and AHF executed an agreement at that time whereby Seiler agreed to sell the 1980 and 1981 foals of Midnight Secret, or her substitute, to AHF for $18,750.00 each. Seiler paid MMM the sum of $7,500.00 at that time and executed a judgment note in favor of MMM in the amount of $37,500.00 plus interest at an annual rate of ten percent (10%). MMM issued an invoice to Seiler at that time for the purchase of a saddlebred horse named Midnight Secret for the sum of $45,000.00.

As an integral part of the plan, Farley drafted a certificate of incorporation for Seiler Stables, Inc. The stated purpose of the corporation was to engage in any lawful activity, "including but not limited to the power to engage in maintaining, racing, breeding, and sale of standardbred horses". Seiler was the sole shareholder of Seiler Stables, which was created in furtherance of the plan to devise a tax shelter for Seiler. Farley had represented to Seiler that he needed to set up a corporation in order to reap the tax benefits from purchasing Midnight Secret.

Midnight Secret, which was cared for and maintained by MMM, produced no foals in 1980 or in 1981. On April 15, 1981, Farley sent a letter to Seiler in his capacity as president of MMM informing Seiler that Midnight Secret had failed to carry foals to term in 1980 and 1981. The letter stated that, in accordance with the agreement of September 15, 1979, it was delivering another broodmare named "Folly" as a replacement.

Farley, in his capacity as president of MMM, sent a letter dated May 15, 1982 informing Seiler that Folly had produced a stud colt. He sent another letter dated July 11, 1982 informing Seiler that Folly again was in foal. Both letters arrived in the same envelope. Aside from the "letters", it is not certain that the foals were in fact ever brought to term.

The next series of significant transactions involving Seiler and Farley took place in August and September of 1982.

The judgment note in the amount of $37,-500.00 plus interest which Seiler executed on September 15, 1979 had not been paid. On August 30, 1982, Seiler executed another judgment note in favor of MMM in the amount of $37,500.00 plus interest at an annual rate of ten percent (10%) from September 16, 1982. Payments on the note were to be made in five (5) equal annual installments of $7,500.00 plus accrued interest.

Seiler also issued a check dated August 30, 1982 in the amount of $15,000.00 made payable to MMM.

AHF and Seiler executed an agreement on September 15, 1982 whereby AHF agreed to purchase from Seiler all of the outstanding shares of Seiler Stables for the sum of $63,750.00. The agreement was signed by Farley on behalf of AHF in his capacity as its secretary. AHF also issued a check at that time made payable to Seiler in the amount of $15,000.00 and executed a promissory note in favor of Seiler for the remaining balance of $48,750.00.

The check issued to MMM by Seiler on August 30, 1982 and the check issued to Seiler by AHF on September 15, 1982 subsequently were negotiated by the respective payees.

A schedule was prepared at that time indicating the schedule of payments by AHF to Seiler pursuant to the agreement of September 15, 1982 and the schedule of payments by Seiler to MMM pursuant to the note he had executed on August 30, 1982. The total amount of payments by Seiler to MMM was equal to the total amount of payments by AHF to Seiler— i.e., $63,750.00.

Farley had advised Seiler that the transactions occurring in August and September of 1982 had been structured "for tax purposes" that were beneficial to Seiler. Farley specifically advised Seiler that the check in the amount of $15,000.00 which he issued on August 30, 1982 was deductible for tax purposes as interest payment to MMM.

Seiler claimed a deduction on his federal tax return for the year 1982 in the amount of $15,000.00 for the check he had issued to MMM on August 30, 1982. Schedule A of the tax return declared it to be payment of interest on the debt owed to MMM. Seiler's tax return for the year 1982 had been prepared on his behalf by Farley.

The claimed interest deduction was not warmly received by the Internal Revenue Service ("IRS"). It disallowed the deduction after conducting an audit and issued a notice of deficiency.

Although Farley had assured Seiler that the deduction was allowable and that he (Farley) "would take care of it", Seiler retained his own legal counsel and challenged the disallowance in the United States Tax Court. Upon advice of his counsel, Seiler reached a settlement with the IRS and paid a total of $27,000.00 to the IRS, including interest and penalties.

Plaintiffs in this action took umbrage at what had happened and brought a civil action against Farley, MMM, and AHF on December 6, 1985 in the United States District Court for the Western District of Pennsylvania at C.A. No. 85–2791. Counts I through III of the complaint alleged violations of RICO. Count IV stated a claim for fraudulent misrepresentation. Count V alleged violations of Pennsylvania's Securities Act. Count VI stated a claim for breach of contract.

This civil action was never tried. On August 21, 1989, judgment was entered by the consent of the parties against Farley, MMM, and AHF in the amount of $25,000.00. The order entered did not contain a recitation of stipulated facts and did not indicate the cause(s) of action upon which liability was based.

Farley has not been a pillar of the community. He has been indicted on several occasions by federal grand juries and has entered a plea of guilty each time. For a while he resided in a federal prison at taxpayers' expense.

Farley was named in an indictment handed down in 1987 in the United States District Court for the Western District of Pennsylvania at CR. No. 87–091. The indictment consisted of thirty-nine (39) counts and accused Farley of separate violations of 26 U.S.C. § 7206(2) in his capacity as tax preparer.

Count One of the indictment charged Farley with willfully and knowingly preparing a false and fraudulent tax return for calendar year 1980 for one Richard F. Long. Farley was accused of failing to report a gain of $5,000.00 which Long had realized from the sale of an asset used in a trade or business.

Count Four charged Farley with willfully and knowingly preparing a false and fraudulent tax return for calendar year 1980 for one Frank A. Lupinacci. Farley was ac-

cused of falsely claiming a depreciation deduction on Schedule C–2 for a broodmare Lupinacci had purchased. The charge was fact specific as to amounts and dates.

Count Eight charged Farley with willfully and knowingly preparing a false and fraudulent tax return for calendar year 1980 for one James Joyce. Farley was accused of falsely claiming a depreciation deduction on Schedule C–2 for a broodmare Joyce had purchased. Again, the charge was fact specific.

Count Eleven charged Farley with willfully and knowingly preparing a false and fraudulent tax return for calendar year 1982 for Terrence Seiler, plaintiff in this action. The conduct at issue pertains to the transactions described previously. Farley was accused of falsely claiming a deduction of $15,000.00 on Schedule A of Seiler's tax return as an interest payment to MMM. The indictment alleges that Farley was aware that Seiler had made no such interest payment and was entitled to no deduction therefor.

The case never went to trial. Farley entered a plea of guilty on December 22, 1987 to Counts One, Four, and Eight. He was sentenced on February 8, 1988 to consecutive five-year periods of probation for each of these counts and was fined $15,-000.00. All remaining counts, including Count Eleven, were dismissed at the time of sentencing.

Farley was accused in another indictment handed down in the United States District Court for the Middle District of Pennsylvania at CR. No. 89–206 with two counts of violating 18 U.S.C. § 1956(A)(3)(B) and 18 U.S.C. § 2. Farley subsequently entered a plea of guilty to Count Two, whereupon he was sentenced to two years' imprisonment and fined $2,500.00. Count One was dismissed at the time of sentencing.

Farley was named in a third indictment handed down in the United States District Court for the Western District of Pennsylvania at CR. No. 90–108 with one count of mail fraud, in violation of 18 U.S.C. § 1341. Farley subsequently entered a plea of guilty and was placed on probation for six (6) months.

On October 31, 1990, Farley filed a voluntary chapter 11 petition. Plaintiffs were listed on the bankruptcy schedules as unsecured creditors having a claim in the amount of $25,000.00. The case was converted upon debtor's motion to a chapter 7 proceeding on May 21, 1991, at which time an interim chapter 7 trustee was appointed. The trustee issued a report on April 9, 1992 which stated that no assets were available for distribution to creditors.

Plaintiffs brought the present adversary action on February 4, 1991. They seek a determination that the debt Farley owes to them is not dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(4). The matter was tried on June 21, 1993, after Farley had been released from prison.

## II

### ANALYSIS

As has been noted, plaintiffs maintain that the debt arising out of the consent judgment entered against Farley on August 21, 1989 at C.A. No. 85–2791 is not dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(4).

#### A) 11 U.S.C. § 523(a)(2)(A).

Section 523(a)(2)(A) provides in pertinent part as follows:

(a) A discharge under section 727 ... of this title does not discharge any individual from any debt— ...

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition ...

11 U.S.C. § 523(a)(2)(A).

In order for the debt at issue here to be nondischargeable pursuant to this provision, plaintiffs must establish that:

(1) debtor obtained money, property, services, or credit from plaintiffs through a material misrepresentation;

(2) debtor knew, at that time, that the representation was false or made it with gross recklessness as to its truth;

(3) debtor intended to deceive plaintiffs;

(4) plaintiffs reasonably relied on the false representation; and

(5) plaintiffs suffered injury as a proximate result of the materially false representation.

*See McMillen v. Jarmul (In re Jarmul),* 150 B.R. 134, 137–38 (Bankr.W.D.Pa.1993).

The standard of proof for determining whether a debt is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) is the preponderance-of-the-evidence standard. *See Grogan v. Garner,* 498 U.S. 279, 289, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991).

Plaintiffs argue that the debt is not dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) on two grounds.

They maintain that Farley falsely represented that Midnight Secret, which they had purchased from him in September of 1979, was a standardbred horse when in reality it was a saddlebred horse.[1]

In addition, plaintiffs maintain that Farley falsely represented to them that the payment of $15,000.00 Seiler made to MMM on August 30, 1982 was deductible on their federal tax return as an interest payment.

### (i) *Saddlebred Horse*

■ The contention that the debt is not dischargeable because Farley falsely represented that he was selling Seiler a racehorse when in reality he had sold him a saddlehorse is without merit.

The first of the required elements enumerated previously has not been met in this case.

To begin with, it is not clear that Farley misrepresented the type of horse he was selling to Seiler. Although the certificate of incorporation for Seiler Stables drawn up by Farley on September 15, 1979 makes reference to standardbred horses, the agreement of sale and the invoice of sale both recite that Midnight Secret was a **saddle**bred horse. Plaintiffs clearly knew the difference between the types of horses and accepted same without complaint.

Even if Farley did misrepresent to Seiler that he was purchasing a standardbred horse, that misrepresentation was not material. Seiler testified that he had purchased a horse from Farley in order to have a tax shelter. According to Seiler, it did not matter to him whether the horse "had only two legs", so long as ownership of the horse provided him with a tax shelter. The fact that Midnight Secret was a saddlebred horse rather than a standardbred horse was not significant to Seiler at the time of purchase.

The fifth of the required elements enumerated previously also is not present in this case. Plaintiffs have not shown that they suffered any injury as a proximate result of the allegedly material false representation that Midnight Secret was a standardbred horse. As has been noted, Seiler's only concern in buying the horse was to have a tax shelter. Evidence presented at trial indicates plaintiffs were able to shelter income as a result of purchasing Midnight Secret. Although plaintiffs ultimately did suffer injury later on when the IRS disallowed the interest deduction claimed on their 1982 tax return, that injury was *not* a proximate result of any misrepresentation as to what type of horse Seiler had bought from Farley.

In summation, plaintiffs knew they were creating a paper transaction wherein their check to defendant was countered by defendant's check to them. They tried to create a tax dodge and it did not work. Defendant paid a criminal penalty and plaintiffs paid with money.

### (ii) *Disallowed Interest Deduction*

Plaintiffs' additional assertion that the debt is not dischargeable pursuant to § 523(a)(2)(A) because Farley falsely represented that the payment of $15,000.00 Seiler made to MMM on August 30, 1982 was deductible for tax purposes as an interest payment also must be rejected.

---

**1.** It was explained at trial that a standardbred horse is a racehorse whereas a saddlebred horse is for show purposes only and is not suitable for racing. In short, plaintiffs are claiming that Farley sold them a show horse when he led them to believe that he had sold them a racehorse.

Plaintiffs made much ado about Farley's guilty plea to Counts One, Four, and Eight of the indictment at CR. No. 87–091. The basis for their reliance upon this guilty plea is far from obvious. They evidently take the position that Farley's guilty plea somehow gives rise to *res judicata* or to collateral estoppel with respect to the present adversary action.

This contention is without merit for several reasons.

■ To begin with, *res judicata* does **not** apply to a dischargeability proceeding where the grounds asserted for nondischargeability already have been adjudicated in a prior proceeding in another forum. The bankruptcy court is not confined to a review of the judgment and record of the prior proceeding when considering dischargeability. *See Brown v. Felsen,* 442 U.S. 127, 139, 99 S.Ct. 2205, 2213, 60 L.Ed.2d 767 (1979).

*Res judicata* would not apply to this case even in the absence of *Brown v. Felsen.*

■ Application of *res judicata* to this case requires a showing by plaintiffs that:

(1) there has been a final judgment on the merits in a prior suit;

(2) involving the same parties or their privies; and

(3) the present suit is based on the same cause(s) of action.

*See U.S. v. Athlone Industries,* 746 F.2d 977, 983 (3d Cir.1984).

■ The first requirement is lacking in this instance. There was no "judgment on the merits" with respect to Count Eleven of CR No. 87–091.

Counts One, Four, and Eight, to which Farley pled guilty, involved parties other than plaintiffs and conduct which differs significantly from that set forth in Count Eleven, which was dismissed.

Count One charged Farley with failing to report a specific gain realized by Richard Long from the sale of an asset used in a trade or business. Counts Four and Eight charged Farley with falsely claiming depreciation deductions on Schedule C–2 for broodmares acquired by Frank Lupinacci

and James Joyce, respectively. The charges related to specific amounts and dates which, when discovered, could not be controverted. Count Eleven charged Farley with falsely claiming an interest deduction on Schedule A of Seiler's tax return for the $15,000.00 payment he had made to MMM. As previously noted, plaintiffs did transmit to defendant a draft in that amount. They failed to mention, however, defendant's draft to plaintiffs in the same amount which created a wash.

The second requirement for *res judicata* also is not present in this case. The same parties (or their privies) are not involved in this case as were involved in CR. No. 87–091. Plaintiffs were not parties to CR. No. 87–091 and are not in privity with any party thereto.

■ Collateral estoppel, unlike *res judicata,* applies to dischargeability proceeding. *See Grogan v. Garner,* 498 U.S. at 284–85, n. 11, 111 S.Ct. at 658 n. 11.

■ Issue preclusion applies when:

(1) the issue sought to be precluded is the same as that involved in prior litigation;

(2) that issue was actually litigated in the prior litigation;

(3) it was determined by a final and valid judgment; and

(4) the determination was essential to the prior judgment.

*See In re Graham,* 973 F.2d 1089, 1097 (3d Cir.1992).

■ This court is not precluded by the judgment of conviction entered at CR No. 87–091 from determining for itself the issue whether Farley fraudulently misrepresented to Seiler that the $15,000.00 payment to MMM was deductible for tax purposes as an interest payment.

The second requirement for collateral estoppel is not present in this instance. This specific issue was not "actually litigated" at CR No. 87–901. Count Eleven, which raised the issue, was dismissed when Far-

ley pled guilty to other counts of the indictment.[2]

■ It therefore remains for **this** court to determine **for itself** whether Farley fraudulently misrepresented to Seiler that the check in the amount of $15,000.00 which Seiler issued to MMM on August 30, 1982 was deductible for tax purposes as an interest payment.

Plaintiffs have failed to demonstrate, by a preponderance of the evidence, that this representation by Farley constitutes, as a matter of law, a fraudulent misrepresentation.

The fourth requirement for denial of dischargeability is not present in this case. Seiler conceded at trial that he seriously doubted the legality of the interest deduction, notwithstanding Farley's repeated assurances to the contrary. It was "too good to be true". Seiler nonetheless went forward with the transaction and claimed the deduction on his tax return, despite his grave misgivings about its legality, because of his desire to shelter income.

Any reliance that Seiler placed upon Farley's representation was not reasonable in light of his own belief that the payment of $15,000.00 to MMM was not properly deductible as an interest payment. Seiler's obsession with sheltering income overwhelmed his own good sense.

Defendant's statement to plaintiffs, indicating a tax shelter can be created, appears to be a statement of opinion by one participant to another that a paper trail can be put together so as to avoid the payment of the taxes lawfully due and payable. A complaint when the plan fails by a participant elicits little sympathy.

### B) Section 523(a)(4).

Plaintiffs also assert in their complaint that the debt in question also is not dischargeable pursuant to 11 U.S.C. § 523(a)(4), which provides in pertinent part that:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt for— ...

(4) fraud or defalcation while acting in a fiduciary capacity....

■ In order for the debt at issue in this case to be nondischargeable pursuant to this provision, plaintiffs must show:

(1) that Farley was acting in a fiduciary capacity; and

(2) that he committed fraud or defalcation in such a capacity.

*See In re Specialty Plastics, Inc.*, 113 B.R. 915, 922 (Bankr.W.D.Pa.1990).

■ The applicable standard of proof for any of the exceptions to dischargeability set forth at Section 523(a) of the Bankruptcy Code is the preponderance-of-the-evidence standard. *See In re Graham*, 973 F.2d at 1101.

Plaintiffs have not given any indication of the specific conduct about which they are complaining in this regard. They either have abandoned this claim or else have left it to the court to figure it out for itself.

■ Plaintiffs have not established that Farley was acting in a fiduciary capacity in any of his dealings with them. To the contrary, all of the above transactions discussed previously were arm's-length transactions.

Moreover, as the previous discussion indicates, plaintiffs have *not* established that Farley defrauded them in any way. It is certainly possible that a fraud occurred; however, decisions cannot be rendered on possibilities alone. We have the impression that all of the facts were not aired. It is also possible that the unstated facts do not hold either party in a favorable light.

■ Defalcation is a failure to account for property that has been entrusted to

**2.** Although plaintiffs apparently have not raised the matter, it perhaps is worth noting that the consent judgment in the amount of $25,000.00 which was entered against Farley at C.A. No. 85–2591 on August 21, 1989 also does not collaterally estop Farley from denying the allegation of fraudulent misrepresentation in this action. The consent judgment which was entered did not indicate the cause of action upon which liability was based and contained no recitation of stipulated facts. There is no basis for inferring that Count IV of the complaint, which stated a claim for fraudulent misrepresentation, was a basis upon which liability rested.

one. *See In re Specialty Plastics,* 113 B.R. at 923. Plaintiffs have not shown that they "entrusted" any of their property to Farley, let alone that he failed to account for it.

To summarize, plaintiffs have offered no evidence to justify denying dischargeability of the debt Farley owes to them pursuant to 11 U.S.C. § 523(a)(4).

An appropriate order shall be issued.